**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **FRANCESCO R. SEBASTIANI, DMD,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 5:20-cv-1093** |
| | § | |
| **BEXAR COUNTY HOSPITAL DISTRICT,** | § | |
| **d.b.a. UNIVERSITY HEALTH SYSTEM,** | § | |
| **UNIVERSITY OF TEXAS HEALTH** | § | |
| **SCIENCE CENTER AT SAN ANTONIO,** | § | |
| **DANIEL PEREZ, DDS,** | § | |
| **PETER LOOMER, DDS, and .** | § | |
| **WILLIAM L. HENRICH, M.D,** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff Francesco R. Sebastiani, DMD ("Plaintiff" or "Sebastiani") complaining of Defendants Bexar County Hospital District, d.b.a. University Health System ("UHS"), University of Texas Health Science Center at San Antonio ("UT Health SA"), Daniel Perez, DDS, ("Perez") Peter Loomer, DDS ("Loomer"), and William L, Henrich, M.D. ("Henrich"), collectively referred to as "Defendants", and for causes of action respectfully shows the Court as follows:

I.

**Introduction**

1.01     Plaintiff would show the Court that Defendant wrongfully expelled him a job and educational position as a resident doctor in an oral surgery program. The expulsion lacked due

process spelled out in his contract in violation of 42 U.S.C. § 1983, and showed bias against Plaintiff on the basis of his sex in violation of Title IX and Title VII, as well as state law. Plaintiff further seeks relief under the FMLA and state whistleblower protection laws.

II.

**Parties**

2.01    Plaintiff Sebastiani is an individual who may be contacted in care of the undersigned counsel.  Plaintiff is a resident and citizen of the State of Texas.

2.02    Defendant Bexar County Hospital District, d.b.a. University Health System ("UHS") is a subdivision of Bexar County, and may be served by delivering citation and service of process to its Chief Executive Officer, George B. Hernandez, Jr.,  4502 Medical Drive, San Antonio, TX 78229.

2.03    University of Texas Health Science Center at San Antonio ("UT Health SA") is a state agency, or state instrumentality, including a public institution of education, and is an employer as defined in §21.002 (8)(D), Texas Labor Code and may be served with process by serving its President, Dr. William L. Henrich,  at his place of work, 7703 Floyd Curl Drive, Mail Code 7834, San Antonio, TX 78229-3900, with copy to the Attorney General's Office.

2.04    Defendant Daniel Perez, DDS, ("Perez") is an individual who violated Plaintiff's due process rights.  He may be served with process at his place of work, 8210 Floyd Curl Drive MC 8124, San Antonio, TX 78229-3900.

2.05    Defendant Dr. Peter Loomer was the Dean of the UT Health SA School of Dentistry who denied Plaintiff's due process appeal. He may be served with process at his place of work, 7703 Floyd Curl Drive, MC 7906, San Antonio, TX 78229.

2.06     Defendant Dr. William L. Henrich is the President of UT Health SA who denied Plainiff's due process rights on appeal. He may be served with process at his place of work, 7703 Floyd Curl Drive, Mail Code 7834, San Antonio, TX 78229-3900.

III.

**Jurisdiction and Venue**

3.01     Pursuant to 28 U.S.C. § 1331, jurisdiction of this Court is appropriate in the United States District Court for the Northern District of Texas, as this action involves a question of the application of federal law, namely violation of Plaintiff's Constitutional rights, Title IX, and 42 U.S.C. §1983.  The Court has supplemental jurisdiction of Plaintiff's State law claims.

3.02     Defendants UHS and UT Health SA have waived any sovereign or governmental immunity to suit or liability under Title IX and Title VII by receiving federal financial assistance in the operation and improvement of the medical school district, and through activities at their facilities. 42 USCA §2000d-7.  Sovereign immunity is also waived as to state law discrimination claims. Texas Labor Code § 21.002(8)(D).  This court has jurisdiction to hear Plaintiff's 42 U.S.C. §1983 civil rights claims, which claims are not barred by the defense of sovereign immunity. *Thomas v. Allen*, 837 S.W.2d 631 (Tex. 1992); *Howlett v. Rose,* 496 U.S. 356, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990).  Counties are not subject to Eleventh Amendment immunity. *Northern Insurance Company of New York v. Chatham County,* 547 U.S. 189, 193 (2006) (counties have neither Eleventh Amendment immunity nor residual common law immunity).

3.03     Venue for all causes of action stated herein lies in the Western District of Texas because the acts alleged in this Complaint took place, in whole or in part, within the boundaries of this District pursuant to 28 U.S.C. §1391.

IV.

## Factual Allegations

4.01    Plaintiff was previously a Chief Resident in an oral surgery program at Brooklyn Hospital Center.  He was forced to leave the program after severe sexual harassment by one of his supervisors, Dr. Pik Lee, after he broke off the relationship.  She stalked him, sent him lewd text messages, and demanded he impregnate her.  When Sebastiani blocked her number, she threatened to end his career, groped him while he was operating on patients, tampered with his patients during an operation as a threat to him, and even threatened to kill Sebastiani, his family, and herself. Complaints to HR and the doctor supervising the residency program were ignored, and Plaintiff was threatened that he would not be able to complete his education anywhere else if he continued with his complaints.  The escalation of Dr. Lee's harassment did not stop until Dr. Lee was arrested, and Plaintiff and his family received criminal orders of protection.  Plaintiff filed a lawsuit circa January 31, 2018 and obtained a restraining order against Dr. Lee. She has since violated the orders. The case is still pending in New York and received publicity.

4.02    Plaintiff sought to continue his education at a medical degree program and came to San Antonio.  He began anew as a resident physician in good standing at the Oral Maxillofacial Residency Program at UT Health SA School of Dentistry. However, he encountered further harassment related to the NY case, culminating in his dismissal from employment and residency on April 16, 2020 in violation of Defendants' procedures and appeal rights, and related to his health and protected activities under Title VII and Title IX.

4.03    The Program Director and chief residents in the residency program here were Drs. Daniel Perez, Nicole Hernandez and Matthew Burks.  The first two were believed to be close friends

and/or having an affair with each other. Dr. Hernandez was a friend of Dr. Pik Lee in New York, and initiated a campaign of harassment which included threats to take Plaintiff's patients, starting rumors, and accusing Plaintiff of mishandling a case where an error was made by another resident. OMS staff took note of her yelling at Sebastiani, and complained to Dr. Perez, but no action was taken.  Dr. Hernandez made plain she was retaliating for the damage to her friend's career.

4.04    The ridicule continued as Hernandez coined the nickname, "Keep it tight Franco," which was quickly adopted by her subordinates and Plaintiff's colleagues. This was referencing his sexual harassment complaint in New York.

4.05    In February of 2019, when it was discovered Plaintiff shaved his legs (he plays sports), Dr. Perez asked, "Are you a faggot? Don't shave your legs if you want to work here." Of course, no such instruction was given to female employees.  This was followed by an incident involving group communication where Dr. Szalay referred to Plaintiff as a part of the "#metoo movement" and referred to Sebastiani in a gag, tie-up, and homosexual rape video with the message "Shhhhh"; "Sebastiana". Such comments became common examples of the verbal abuse directed towards Plaintiff. The most egregious incident occurred when Dr. Hernandez texted Plaintiff an image of her strap-on dildo to violate Plaintiff with and Dr. Brown displayed demeaning sex toys and homosexual lingerie on the OMS clinic resident room TV as well as a disturbing video referencing anal sex rape directed towards Plaintiff. Plaintiff has the text messages and submitted them to the hospital and school, but no action was taken.

4.07    Continuing in retaliation during the period of March through April 2019, Dr. Perez and chief residents unjustly increased Plaintiff's work and call schedule requiring a 26-day straight work schedule (violating duty hour rules). In June 2019, VA Dentistry Program Director Dr.

Douglas reported Dr. Burks' extreme and unwarranted verbal harassment towards Dr. Sebastiani to Dr. Perez – including but not limited to screaming, cursing, threatening of position, and sexual slander – which ultimately only made Plaintiff's situation worse.

4.08    In early 2020, while Plaintiff was providing general anesthesia to a patient, an OMS Chairman Dr. Ellis commented: "We will send you back to wherever you came from, Italy or New York. It will be the end of a short career for you."

4.09    On or about March 7, 2020, Plaintiff was contacted by Jodi Stone, the finance manager.  She reported by e-mail that Dr. Perez alleged he stole the $2,000 research grant from the American Academy of Implant Dentistry from the OMS Department. Plaintiff was able to show the check was cashed by UT Health OMS on January 7, 2020.

4.10    On or about March 22, 2020, Dr. Ellis sent Plaintiff an e-mail requesting "proof" of accolades on his bio for biometric research in the application for a $20,000 research award Plaintiff got for the department. Plaintiff immediately provided reference information.

4.11    On or about March 27, 2020, Plaintiff became ill and vomited twice, as well as experiencing sweating.  He contacted the chief resident and was instructed to go home.  Plaintiff was instructed to consult UT Health SA Primary Care Physician Dr. Kimberly Ellis. She advised him that under the Covid-19 protocol, he was required to remain home for 7 days and symptom free for 72 hours before returning to work. She also referred him for Covid-19 testing, which eventually came back negative. During his medically directed leave, Assistant General Surgery Program Director Dr. Jason Kempenich, emailed him citing false performance allegations and dismissed Plaintiff from the rotation without first giving him an opportunity to rebut the accusations.

4.12    On or about March 31, 2020, Dr. Perez sent Plaintiff an e-mail with Dr. Ellis cc'd

regarding "Symptoms," and asked for a description of symptoms and test results.  The same day, Dr. Perez called questioning the veracity of Plaintiff's symptoms.

4.13    On or about April 1, 2020, Dr. Perez called again, and requested to know Plaintiff's location and symptoms. He then requested a meeting to discuss research.  Later the same day, he e-mailed Plaintiff and said there was no need to meet.

4.14    On or about April 4, 2020, Dr. Perez called and berated Plaintiff.  He told Plaintiff: "I told you to shine and you didn't shine on the general surgery rotation." He went on to state: "We took you in and didn't ask questions about previous employment, but now we found out."   In apparently reference to his illness, Perez said: "I don't believe you."  He went on to say: "You won't get another chance."

4.15    On or about April 6, 2020, Dr. Perez called Plaintiff again. A message at the beginning of the call indicated Perez was recording the call, though Dr. Perez has since refused to provide either the recording or the automatic transcription of the call.  Dr. Perez told Plaintiff he was dismissed from the program and had only until Wednesday to appeal the decision by dental school committee vote.  However, he told Plaintiff he had an "indefensible document" against him which referenced the Brooklyn Hospital litigation.   Perez continued: "I just spoke with the hospital attorney, and even if you appeal your dismissal, you can't complete your last month of general surgery rotation, so there's no way for you to continue here." Perez strongly indicated Plaintiff should resign repeatedly, and that there was no way his word was believable over that of Perez as faculty.

4.16    On or about April 8, 2020, Plaintiff spoke with Dr. Duncan, who indicated that Dr. Perez told him before the Covid-19 symptoms that Plaintiff had been doing well, and that Duncan

had no issues with him in the OMS clinic. Duncan indicated he would speak with Dr. Perez.

4.17     The following day, on April 9, 2020, Dr. Duncan reported back that he spoke with Dr. Perez, and the issue was allegedly in General Surgery.  He indicated he would write Plaintiff a letter on his performance in the OMS department. Plaintiff received notice of a recommendation of dismissal from the program, with a hearing to follow on April 15, 2020.  No notice was provided of who the hearing officers would be.

4.18     On information and belief based on statements relayed to Plaintiff by those on the call, Dr. Perez told the entire OMS Department Faculty and Staff that Plaintiff was fired for absences from work, and not being there due to medical leave.  Dr. Perez apparently said: "If anyone wants to write a letter for Franco, it doesn't matter, he's already fired."

4.19     On or about April 11, 2020, Plaintiff spoke with staff coordinator Delmari Arriola regarding allegations of impropriety concerning a Botox procedure.  She responded that she told Dr. Perez that "everything was fine", and that Plaintiff had done nothing wrong.

4.20     On or about April 14, 2020, Plaintiff engaged in phone and/or text communications with senior supervising anesthesiologist and attorney Dr. Wendy Kang indicating that Dr. Perez and the OMS Department were biased against Plaintiff.  She also mentioned that she learned from Dr. Perez that Plaintiff did not come to UT Health SA with a "clean slate", in apparent reference to Plaintiff's discrimination complaints in NY.

4.21     On or about April 15, 2020, Plaintiff attended a hearing via Zoom to appeal his termination while still out on sick leave, but was not provided the allegedly "indisputable" document against him, was not provided a copy of the recording of Dr. Perez or the transcription of the discussion, and was not given adequate notice of charges against him.  Plaintiff was dismissed from

the program effective April 16, 2020.  Defendants denied subsequent administrative appeals, apparently without taking the matter seriously.

4.22   On or about April 29, 2020, Dr. Sebastiani was released to return to work. At this point, he was not allowed to return because he was discharged during his medical leave.

V.

First Count

## Title IX

(Against Defendants UHS and UT Health SA)

5.01   Plaintiff incorporates the foregoing provisions as if set forth herein verbatim.

5.02   Title IX applies to universities and teaching hospitals participating in residency programs, since the statute applies to an "education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a); *see also*, *Doe v. Mercy Catholic Medical Center*, 850 F.3d 545 (3rd Cir. 2017)(Title IX applied to teaching hospital affiliated with Drexel University's medical school).  Defendant UHS regularly receives federal funds through such programs as Medicare and Medicaid.

5.03   "Title IX provides that '[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" *Stiles ex rel. D.S. v. Grainger County*, 819 F.3d 834, 848 (6th Cir. 2016) (*quoting* 20 U.S.C. § 1681(a)). "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).  *Doe v. Baum*, 227 F.Supp.3d 784, 816 (E.D. Mich. 2017).  Title IX "is enforceable through an implied private right of action ... for

monetary damages as well as injunctive relief." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir.1994). Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline. *Id.* at 715. It further bars sexual harassment in a manner similar to Title VII. The Supreme Court has further now recognized that Title VII, and presumably Title IX as well, prohibits discrimination on the basis of sexual orientation. *See, Bostock v. Clayton County,* 590 U.S. ___, 140 S.Ct. 1731 (2020).

5.04 The Supreme Court has recognized that "the private right of action implied by Title IX encompasses claims of retaliation." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005). In Jackson, the Court explained that when a federally-funded educational institution "retaliates against a person because he complains of sex discrimination, this constitutes intentional discrimination on the basis of sex, in violation of Title IX." *Id.* at 174, 125 S.Ct. 1497 (internal quotation marks omitted). At the pleading stage, the plaintiff is required to sufficiently allege two elements to state a Title IX retaliation claim. First, he must allege that he engaged in protected activity under Title IX, and second, he must allege that — as a result of his protected activity — he suffered an adverse action attributable to the defendant educational institution. *See Coleman v. Md. Court of Appeals*, 626 F.3d 187, 191 (4th Cir. 2010); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015); *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 693–94 (4th Cir. 2018). Plaintiff alleges both here in that he filed a lawsuit in connection with harassment at the NY school under Title IX and Title VII, and then again complained of harassment to Defendants. He endured adverse treatment through harassment ultimately culminating in discharge from the program.

5.05 In *Yusuf*, the Second Circuit developed a framework for cases attacking university

disciplinary proceedings on the ground of gender bias, which "fall generally within two categories", "erroneous outcome" and "selective enforcement." 35 F.3d at 715.  In the first category, "erroneous outcome" cases, "the claim is that the plaintiff was innocent and wrongly found to have committed an offense." *Yusuf*, 35 F.3d at 715. A plaintiff making an erroneous outcome claim must first "allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Id*. Once the plaintiff has established doubt concerning the accuracy of the proceeding, they must next "allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id*. (citations omitted). The *Yusuf* court noted that "[s]uch allegations might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id*.  In the second category, "selective enforcement" cases, the "claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id*.  *Doe v. Brown University*, 166 F.Supp.3d 177, 185 (D. R.I. 2016).

5.06    Plaintiff was subjected to "erroneous outcome" discrimination.  Plaintiff submitted multiple supporting statements from physicians he had worked with and had never received a poor written evaluation previously.  Statements by Dr. Perez indicated an intent to discriminate on the basis of perceived sexual orientation, and also indicated retaliatory intent due to Plaintiff's protected activity in the New York action.

5.07    Plaintiff also received "selective enforcement", in that there was no known other instance where a resident was discharged from the program without first receiving some sort of probation and opportunity to cure alleged deficiencies, as was indicated in the due process

procedures of Defendants. In fact, the Advanced Dental Education Probation and Dismissal Policy provided probation and an opportunity to cure was required before dismissal except where failing grades had been received, which did not happen here. Dr. Perez had twice denied Plaintiff the opportunity to take the OMSITE standardized test, which would have allowed him to demonstrate his competence via his peers in an independently graded test.

5.08    As a result of Defendants' gender bias and intent to retaliate, Plaintiff has been injured by being improperly expelled, being denied due process, being barred from his medical education, damage to his reputation, mental anguish, and impairment to income. He further seeks recovery of his attorney's fees, costs, and any expert fees.

VI.

Second Count

**Denial of Due Process under 42 U.S.C. § 1983**

(Against Dr. Perez, Dean Loomer, and President Henrich)

6.01    Plaintiff incorporates the foregoing provisions as if set forth herein verbatim.

6.02    Plaintiff had and has a protectable liberty interest in pursuing his public medical school education at UT Health SA under both the Texas and US Constitutions.  *University of Texas Medical School at Houston v. Than*, 901 S.W.2d 926, 930 (1995); *Dixon v. Alabama State Bd. Of Educ.*, 294 F.2d 150, 157 (5th Cir.), *cert. denied*, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961); Tex. Const. Art. I, §19; U.S. Const. Amend. XIV, § I.  He further had a property interest in his Graduate Dental Education Agreement, which provides in relevant part that: "Certain aspects of the appointment of the Resident to the Residency Program, the terms and conditions of that appointment, and Resident's activities in the Residency Program are governed

by the CODA policies of UT Health SA contained in the UT Health SA Program's Policy and Procedures Manual.  The Program Policy Manual includes and specific reference is hereby made to resident responsibilities; duration of appointment; … *grievance and due process*; … policies on leaves of absence including vacation, parental, sick and other leave(s) for residents …; timely notice of the effect of such leave(s) on the ability of residents to satisfy requirements for program completion." Graduate Dental Education Agreement, ¶2.06.  UT Health SA further warrants that it will "supervise and control the Resident's activities consistent with this Agreement and in accordance with the standards, guidelines and requirements promulgated by the CODA or other accrediting bodies." Graduate Dental Education Agreement, ¶4.01 (*emphasis added*).

6.03    What process is due is measured by a flexible standard that depends on the practical requirements of the circumstances. *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976); *Goss v. Lopez*, 419 U.S. 565, 578, 95 S.Ct. 729, 738-39, 42 L.Ed.2d 725 (1975). This flexible standard includes three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. Mathews, 424 U.S. at 335, 96 S.Ct. at 903; *Than*, 901 S.W.2d at  930.

6.04    At a minimum, when university officials seek to sanction a student for misconduct, Texas due course of law requires oral or written notice of the charges against the student and, if the student denies them, an explanation of the evidence the authorities have and an opportunity to present his or her side of the story. *Than*, 901 S.W.2d at  931.  Presentation of

*ex parte* evidence to the hearing officer denies due process and requires a new hearing. *Than*, 901 S.W.2d at 932-33. Federal law reaches the same result. *See, e.g., Shaboon v. Duncan*, 252 F.3d 722, 730 (5th Cir. 2001) (assuming, without deciding, that medical resident had protected interest in her position); *Davis v. Mann*, 882 F.2d 967, 973 (5th Cir. 1989) (assuming the existence of a liberty or property interest and holding that dental resident received adequate process under Fourteenth Amendment); *Dixon v. Alabama State Bd. of Ed.*, 294 F.2d 150, 157 (5th Cir. 1961) (holding that there must be some notice and hearing before student expulsion from state college or university because students had interest in their college education).

6.05    Sebastiani was summarily suspended based on a vague e-mail and evidence not provided to him with an opportunity to dispute it.  Statements from Dr. Perez indicated the subsequent hearing was a mere formality, and Perez actively discouraged doctors from providing any support for Sebastiani, thereby showing bias and a fundamental lack of fairness.  Plaintiff was denied any meaningful pathway to confront his accusers, in violation of the 5th and 6th Amendments. U.S. Const. Amend. V, VI, XIV.  Further, it was fundamentally unfair to conduct a sham hearing at a point when Dr. Sebastiani was still on medical leave due to his illness and had not been cleared to return to work or school.

6.06    In its race to judgment, Plaintiff was denied access to the evidence considered by the tribunal against him.  His requests for the "indisputable evidence" considered by Dr. Perez in bringing the charges, as well as the refusal to provide the recording of the phone conversation with Dr. Perez showing retaliatory motive further deprived Plaintiff of essential evidence.

6.07    Plaintiff was not allowed to cross examine Perez regarding the basis of his allegations, which were generalized and lacked specifics. In the famous words of John Henry

Wigmore, cross-examination is "beyond any doubt the greatest legal engine ever invented for the discovery of truth." 3 Wigmore, Evidence § 1367, p. 27 (2d ed. 1923). The ability to cross-examine is most critical when the issue is the credibility of the accuser. *See, Donohue v. Baker*, 976 F.Supp. 136, 147 (N.D.N.Y.1997) ("[I]f a case is essentially one of credibility, the 'cross-examination of witnesses might [be] essential to a fair hearing.'") (*quoting Winnick v. Manning*, 460 F.2d 545, 550 (2d Cir.1972)); *Doe v. Brandeis University*, 177 F.Supp.3d 561, 605 (D. Mass. 2016)(not a due process case, but held lack of cross examination may have had a very substantial effect where contest between two witnesses.)

6.08   As a result of Defendant's sex bias, retaliation and lack of due process, Plaintiff has been injured by being improperly expelled, being denied due process, mental anguish, and damage to his reputation.

6.09   Plaintiff has been required to obtain the assistance of counsel to represent him in this matter, for which he is entitled to recover under federal law. 42 U.S.C. §1988(b).  Plaintiff is further entitled to recover expert fees and costs of court. 42 U.S.C. § 1988(c). Plaintiff seeks an injunction ordering him immediately reinstated to his position until such time as a hearing can be held which fully complies with due process, including a fair and impartial tribunal.

6.10   Neither Drs. Perez,  Loomer nor Henrich are entitled to qualified immunity, because their conduct was objectively unreasonable in light of clearly established law at the time of the dismissal.  At a minimum, when university officials seek to sanction a student for misconduct, due process requires oral or written notice of the charges against the student before action is taken and, if the student denies them, an explanation of the evidence the authorities have and an opportunity to present his or her side of the story.  *Than*, 901 S.W.2d at 931.  Clearly established law establishes

that presentation of *ex parte* evidence to the hearing officer denies due process and requires a new

hearing. *Than*, 901 S.W.2d at 932-33. No qualified immunity exists because a reasonable person

would have known such basic constitutional standards must be followed. The Confrontation Clause

of the U.S. Constitution is well known as an essential protection of due process. U.S. Const. Amend.

VI, XIV. Likewise, Title IX is well established to prevent retaliation against a student for seeking

protection from sexual discrimination at a university, such as Dr. Sebastiani was doing with the NY

lawsuit.

VII.

Third Count

**<u>Breach of Contract – Due Process</u>**

(Against UHS and UT Health SA)

7.01    Plaintiff incorporates the foregoing provisions as if set forth herein verbatim.

7.02    Plaintiff had a property interest in his Graduate Dental Education Agreement,

which provides in relevant part that:

> Certain aspects of the appointment of the Resident to the Residency Program, the terms
> and conditions of that appointment, and Resident's activities in the Residency Program
> are governed by the CODA policies of UT Health SA contained in the UT Health SA
> Program's Policy and Procedures Manual.  The Program Policy Manual includes and
> specific reference is hereby made to resident responsibilities; duration of appointment; …
> *grievance and due process*; … policies on leaves of absence including vacation, parental,
> sick and other leave(s) for residents …; timely notice of the effect of such leave(s) on the
> ability of residents to satisfy requirements for program completion.

Graduate Dental Education Agreement, ¶2.06 (*emphasis added*).  UT Health SA further warrants

that it will "supervise and control the Resident's activities consistent with this Agreement and in

accordance with the standards, guidelines and requirements promulgated by the CODA or other

accrediting bodies." Graduate Dental Education Agreement, ¶4.01 (emphasis added).

7.03    The UT Health SA Program's Resident Policies and Procedures Manual further provides: "Due process for each resident will be in accordance with the UTHSCSA Graduate Medical Education Policies."  Resident Policies and Procedures Manual, ¶ XII. This same section provides for a formal grievance procedure in the event of dismissal within thirty working days after the date of notification of the proposed adverse status. *Id.*  In fact, the proceedings against Plaintiff were flagrantly in violation of such polices in a number of respects:

- The Advanced Dental Education Probation and Dismissal Policy provides for probation before dismissal unless a final grade of D or F for four or more credit hours is received, or an unsatisfactory grade on pass/fail course work.  No such grades were given to Plaintiff;

- The Policy provides: "The student will be allowed an opportunity to correct the substandard performance that led to academic probation status over a probationary time period to be determined by the departmental Residency Oversight Committee." No such opportunity to cure was provided.

- According to UT Health Science Center Handbook of Operating Proceedings (Policy 14.1.1), Plaintiff was entitled to a fair and impartial hearing, which he did not receive;

- The Handbook provides for ten days' written notice of the hearing and the identity of the hearing officer. Plaintiff was given only six days' notice during a time when he was on medical leave (Section 5.2);

- By not disclosing the hearing officer, Plaintiff was deprived of the right to challenge impartiality (Section 5.3);

- Plaintiff was not allowed to present live testimony, cross-examine witnesses, or receive assistance from an advisor of his choice (Section 5.5(b)); and

- The hearing failed to provide a written decision with "findings of fact and a conclusion as to whether the accused student is responsible for the violations as alleged (Section 5.4); and

7.04   Plaintiff timely filed a grievance challenging his dismissal from the program, which was summarily denied.   Plaintiff is entitled to an injunction enforcing compliance with Plaintiff's contractual rights, and resulting damages including lost pay and benefits.

VIII.

Fourth Count

**Breach of Contract - Leave Policy Violations**

(Against UHS and UT Health SA)

8.01.   The foregoing paragraphs of this Complaint are incorporated in this Count by reference as if set forth at length herein.

8.02   Plaintiff had a property interest in his Graduate Dental Education Agreement, which provides in relevant part that:

> Certain aspects of the appointment of the Resident to the Residency Program, the terms and conditions of that appointment, and Resident's activities in the Residency Program are governed by the CODA policies of UT Health SA contained in the UT Health SA Program's Policy and Procedures Manual.  The Program Policy Manual includes and specific reference is hereby made to resident responsibilities; duration of appointment; … grievance and due process; … *policies on leaves of absence including* vacation, parental, *sick and other leave(s) for residents* …; timely notice of the effect of such leave(s) on the ability of residents to satisfy requirements for program completion.

Graduate Dental Education Agreement, ¶2.06 (*emphasis added*).  UT Health SA further warrants that it will "supervise and control the Resident's activities consistent with this Agreement and in

accordance with the standards, guidelines and requirements promulgated by the CODA or other accrediting bodies." Graduate Dental Education Agreement, ¶4.01 (emphasis added).

8.03    Plaintiff complied with the UT Health SA Covid-19 and sick leave policies by reporting his illness, taking off work to prevent potential spread of an infectious disease, reporting to a doctor for examination and then following medical advice to remain off work pending recovery.

8.04    Defendant UT Health SA breached the agreement by dismissing Plaintiff for legitimate absences under such policies.

8.05    As a result of Defendants' unlawful conduct, Plaintiff was wrongfully dismissed from the program.  He has also suffered mental anguish, inconvenience, loss of enjoyment of live, humiliation, and damage to his reputation.

8.06     Plaintiff is entitled to an injunction enforcing compliance with Plaintiff's contractual rights, and resulting damages including lost pay and benefits.

IX.

Fifth Count

**HOSPITAL WHISTLEBLOWER CLAIM**
**(Tex. Health & Safety Code §161.134-135)**

(Against UT Health SA and UHS)

9.01.    The foregoing paragraphs of this Complaint are incorporated in this Count by reference as if set forth at length herein.

9.02    Defendant UHS was a hospital, mental health facility, or treatment facility under Chapter 161 of the Texas Health and Safety Code. Defendant UT Health SA controlled individuals working at such a facility.

9.03    Defendants wrongfully disciplined and/or terminated Plaintiff's employment for reporting violations of law to his supervisor.  Plaintiff protested that reporting to the facility to meet with Dr. Perez, as was initially requested, would violate state and county quarantine orders and endanger patients by potentially exposing them to Covid-19.  Perez mentioned that Plaintiff's absences were a reason for the dismissal.  Claimant is further entitled to a statutory presumption of discrimination because the termination happened within sixty (60) days following his protest of the quarantine orders. Tex. Health & Safety Code §161.134(f).

9.04    As a result of the foregoing, Plaintiff is entitled to injunctive relief, damages or both.

9.05    Plaintiff has further suffered mental anguish damages, and is entitled to exemplary damages, as well as reasonable attorney's fees.

9.06    To the extent Plaintiff was not an employee of either entity, the discrimination against him was unlawful under Section 161.135, which prohibits discrimination against non-employees. *See* Tex. Health & Safety Code §161.135.

X.

Sixth Count

**FAMILY AND MEDICAL LEAVE ACT OF 1993**

(Against All Defendants)

10.01.  The foregoing paragraphs of this Complaint are incorporated in this Count by reference as if set forth at length herein.

10.02   Plaintiff was an eligible employee under the FMLA.  Claimant had worked for Defendants UHS and/or UT Health SA for at least twelve (12) months and had worked at least 1,250 hours during the twelve (12) months prior to taking protected leave.

10.03   Defendants UHS and/or UT Health SA were subject to the provisions of the FMLA. Respondents employed at least fifty (50) employees within a seventy-five (75) mile radius of Claimant's work site for twenty (20) or more work weeks in the prior or current calendar year. Alternatively, such entities were covered public agencies as that term is defined under the statute. *See,* 29 U.S.C. § 2611(4)(A)(iii). Defendant UHS was Plaintiff's W-2 employer, and disbursed his paychecks. On information and belief, both are responsible as "joint employers" under DOL regulations since UHS benefited from hospital care to patients admitted to its facility. *See,* 29 C.F.R. § 825.106 (2020).

10.04   At the time of the discharge, Plaintiff had suffered from one or more "serious health conditions" as defined by the FMLA.  29 U.S.C. § 2611(11).  In particular, Plaintiff was suffering from flu-like symptoms which persisted for four or more days, and required the care of his physicians for treatment for these conditions.

10.05   Defendant interfered with Plaintiff in the exercise of his FMLA rights by failing to inform him of his right to FMLA leave as required under DOL regulations. *See* 29 C.F.R. §825.300(b).  Defendants further interfered by dismissing Plaintiff from work and his program position by failure to reinstate Plaintiff to his position before medical leave. The failure to reinstate following leave constitutes both interference with leave, and improper discrimination because of the use of leave.

10.06   As a result of his termination by Defendants, Plaintiff has suffered significant financial loss, and the loss of salary and benefits of his employment, including health insurance for himself.

10.07   The aforementioned acts were and are a willful violation of the FMLA and entitle

Plaintiff to recover damages as provided by 29 U.S.C. §2617, including liquidated damages. Plaintiff further seeks reinstatement to his position or a comparable position with reinstatement of benefits and seniority time.

10.08   As a result of Defendants' actions, Plaintiff has found it necessary to hire the services of the undersigned attorneys, for which Plaintiff seeks further relief.

10.09   Defendant UHS is not subject to any Eleventh Amendment sovereign immunity as Plaintiff's W-2 employer. *Northern Insurance Company of New York v. Chatham County*, 547 U.S. 189, 193 (2006) (counties have neither Eleventh Amendment immunity nor residual common law immunity).  While Defendant UT Health SA may enjoy Eleventh Amendment immunity from an award of monetary damages, its agents are still subject to injunctive relief compelling compliance with the FMLA. *See, Coleman v. Court of Appeals of Maryland,* 566 U.S. 30, 132 S.Ct. 1327, 1350 (2012)(dissenting opinion). Supervisors normally have personal liability for violations under the FMLA. *Modica v. Taylor*, 465 F.3d 174 (5th Cir. 2006).

## XI.

## Jury Trial Demanded

11.01   Plaintiff hereby demands trial by jury of all claims to which he is entitled.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer herein, and that upon final trial, Plaintiff have and recover the following relief against Defendant.

(1)   Judgment for actual damages in the amount of past and future lost earnings and benefits, damages to past and future earnings capacity due to his wrongful dismissal,

and past and future medical expenses for loss of his expenses;

(2) Judgment for past and future pecuniary losses, emotional pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses;

(3) Exemplary damages in an amount to be determined by the trier of fact;

(4) A preliminary and permanent injunction ordering Sebastiani be reinstated, and that Defendants comply with the FMLA and due process in any subsequent proceedings;

(5) An order by the Court clearing Plaintiff's transcript of all mention of the charges against him;

(6) Prejudgment and post-judgment interest at the maximum legal rate;

(7) Attorney's fees;

(8) Experts fees;

(9) All costs of court; and

(10) Such other and further relief to which Plaintiff may be justly entitled.

DATE: September 14, 2020.

Respectfully submitted,

**KILGORE & KILGORE, PLLC**

By:  */s/ Theodore C. Anderson*
    THEODORE C. ANDERSON
    State Bar No. 01215700
    tca@kilgorelaw.com

    JOHN H. CROUCH, IV
    State Bar No. 00783906
    jhc@kilgorelaw.com

3109 Carlisle, Suite 200
Dallas, TX  75204
(214) 969-9099 - Telephone
(214) 953-0133 - Fax

**ATTORNEYS FOR PLAINTIFF**
**FRANCESCO SEBASTIANI**